STATE OF MISSOURI, on the Information of J. E. TAYLOR, Attorney General, Relator, v. CURRENCY SERVICES, INC., OF MISSOURI, a Corporation; ELMER G. RIEK, an Individual, and ORVILLE G. HUGHES, an Individual, doing business as partners at 1721 Washington Street, in the City of St. Louis, State of Missouri, under the style and firm name and fictitious name of SERVICE EXCHANGE Co., Respondents.—No. 40563.—218 S. W. (2d) 600.

Court en Banc, February 14, 1949.

Rehearing Denied, March 14, 1949.

984

*J. E. Taylor,* Attorney General, *Tyre W. Burton* and *George W. Crowley,* Assistant Attorneys General, for relator.

*John W. Mueller* and *Harold F. Hecker* for respondent Currency Services, Inc.; *Walther, Hecker, Walther & Barnard* of counsel.

*Dubail & Judge* for respondents Elmer G. Riek and Orville G. Hughes, doing business as Service Exchange Company.

[601] CLARK, J.—The Attorney General, as relator, filed an information in this court alleging that the respondents have been and are illegally engaged in certain business practices, permissible by law only to incorporated banks; praying that the charter of the corporate respondent be forfeited, that all the respondents be ousted and restrained from exercising the franchises and privileges of banks and that a fine be assessed against each of the respondents.

After we had caused our writ to issue and respondents had made return thereto, we appointed Honorable J. Marvin Krause, of the St. Louis Bar, as Special Commissioner to hold hearings and report as to the facts and law of the case. His report was duly filed in which he found for relator upon all issues except as to a conspiracy.

There is no dispute as to the facts found by the Special Commissioner which, so far as relevant, are as follows:

Respondent Currency Services is incorporated under the general business and manufacturing statutes of this state, [Laws of Mo. 1943, p. 410.] a portion of its articles purporting to authorize it "to buy and sell 'bondified' post-card checks and 'bondified' money-orders

and other business and financial forms; to give aid and assistance in the transfer of monies, deposits; . . . to distribute money-orders, checks, . . . '' It purchases copyrighted forms for checks, money orders and other supplies from a [602] Minnesota corporation. The check forms are printed on the reverse side of a postal card. The so-called money orders are in legal effect nothing more than checks. These forms are furnished to agents of Currency Services and sold for the amount of the check plus a small fee, depending on the amount of the check. They are usually issued for sums ranging from $1.00 to $100.00 and sold to persons having no bank accounts. When sold the agent fills in the amount and signs his name as agent under the printed signature of Currency Services, Inc. At stated times the agents remit to Currency Services the face amount of all checks sold plus 60% of the amount of fees collected. The checks are drawn on an account maintained by Currency Services in the Industrial Bank & Trust Company, a duly licensed bank incorporated under the laws of Missouri. No checks except those sold as aforesaid are drawn on this account. Currency Services is under contract with the bank to maintain a balance in this account of not less than $10,000.00 and furnishes a bond to the bank to provide against overdrafts.

Currency Services has about 170 agents for the sale of checks, mostly in St. Louis and suburban territory. The other respondents, Riek and Hughes, doing business as partners under the name of Service Exchange Co., are such agents.

Our Special Commissioner did not find respondents guilty of any fraud, indicated that they are operating their business in good faith with rigid restrictions upon themselves and agencies, but held that they are engaged in the business of banking. However, the report says: ''Eliminating bookkeeping and other normal business methods, the sale and issuance of the checks and money orders, and on occasion the return of the purchaser's money, are the only acts that might be considered banking practice.''

By its return to our writ and its exceptions to the report of the Special Commissioner, Currency Services contends that its operations do not constitute banking business as contemplated by our statutes; and that Section 7890. upon which relator's information is founded, violates certain specified provisions of the State and Federal Constitutions. [All references to statutes, unless otherwise stated, are to Revised Statutes of Missouri 1939, and Mo. R. S. A.]

The other respondents raise the same points and also contend that, as agents, they are not liable even though it be held that the business of Currency Services constitutes banking.

The charter of Currency Services purports to authorize it to do the precise business which it is doing; but, although the charter has been approved by the proper state authorities, it may be forfeited if it conflicts with a valid statute. That brings us to the prob-

lem of whether the corporate charter conflicts with Section 7890, mainly relied upon by the Attorney General; and, if so, whether that section is a valid enactment. That section reads as follows:

"No corporation, domestic or foreign, other than a corporation formed under or subject to the banking laws of this state or of the United States, except as permitted by such laws, shall by any implication or construction be deemed to possess the power of carrying on the business of discounting bills, notes or other evidences of debt, of receiving deposits, of buying and selling bills of exchange, or of issuing bills, notes or other evidences of debt for circulation as money, or of engaging in any other form of banking; nor shall any such corporation, except an express company having contracts with railroad companies for the operation of an express service upon the lines of such railroad companies, or a transatlantic steamship company, or a telegraph or telephone company, possess the power of receiving money for transmission or of transmitting the same, by draft, traveler's check, money order or otherwise."

We have been furnished with a number of citations relative to what constitutes a "bank" and "banking business." 7 Corpus Juris, pages 474-5, says: "the principal attributes of a bank are the right to issue negotiable notes, to discount notes, and to receive deposits." An old New York case, People v. Bartow, 6 Cowen 290, held that "to keep an office of deposit, for the purpose of discounting notes, is a specific [603] violation of the statute." Michie on Banks and Banking, Vol. I, page 10, "The business of banking, as defined by law and custom, consists in . . . receiving deposits payable on demand; . . . buying and selling bills of exchange." Our statute, Section 7998, while not purporting to give an all inclusive definition of the term "bank," says it "shall include any person, firm, association or corporation soliciting, receiving or accepting money, or its equivalent, on deposit as a business, whether such deposit is made subject to check, or is evidenced by a certificate of deposit, a pass book, a note, a receipt or other writing." Respondents do not receive or accept on deposit. [See White v. Greenlee, 330 Mo. 135, 49 S. W. (2d) 132, l. c. 134; Gimbel Bros. v. White, 10 N. Y. Supp. (2d) 666; Meserole Securities Co. v. Cosman, 253 N. Y. 130, 170 N. E. 519; Chase & Baker Co. v. Nat'l Trust & Credit Co., 215 Fed. 633.] None of the citations listed in this paragraph mention practices indulged in by Currency Services, unless it be "the buying and selling of bills of exchange."

In Wells Fargo & Co. v. Northern Pac. Ry. Co., 23 Fed. 469, [1884] the United States Circuit Court held that the plaintiff was not engaged in the banking business although its statutory charter, among other things, authorized it to "draw, accept, endorse, buy, sell and negotiate drafts and bills of exchange." It should be noted that the sale of checks by Currency Services is similar to and comes

into direct competition with a part of the business of express companies. Our Special Commissioner so found.

The Attorney General's brief vigorously argues that respondents violate that part of Section 7890 relating to "buying and selling bills of exchange." Our Special Commissioner based his finding entirely upon that clause of the statute by stating in his report that "the sale and issuance of the checks and money orders, and on occasions the return of the purchaser's money, are the only acts that might be considered banking practices."

For some purposes a check is a bill of exchange and so defined by our statute, Section 3200, relating to negotiable instruments, but in banking parlance there are important differences between a check and a bill of exchange. [Hays v. The Bank, 75 Mo. App. 211, 1. c. 213.] That case was decided before the enactment of the negotiable instruments act, but practically the same distinctions between checks and bills of exchange are recognized in Article III of that Act, Section 3200 to Section 3208, inclusive. We do not believe that Section 7890, where it speaks of buying and selling bills of exchange, has any reference to ordinary checks. The purpose of the statute is to vest in duly incorporated banks the exclusive power to carry on a banking business. While banks cash checks and sell drafts we do not speak of them as buyers or sellers of checks. The first part of Section 7890 speaks of the business of buying and selling "bills of exchange;" the last part speaks of the transmission of money "by draft, traveler's check, money order;" clearly recognizing a distinction between bills of exchange and drafts, checks and money orders. But even if the reference to bills of exchange in the first part of the section could be construed to mean checks, it still would not clearly cover the business carried on by respondents. The statute speaks of *buying and* selling bills of exchange. Respondents do not *buy* checks; they sell the personal checks of Currency Services drawn on a duly licensed bank.

The last part of Section 7890, which purports to confine to banks and certain favored corporations the business of transporting money by check, etc., does, if valid, prohibit respondents from carrying on their business. This part of the section is attacked by respondents as being in violation of certain sections of the State Constitution, to wit, Article III, Section 23, [no bill shall contain more than one subject which shall be clearly expressed in its title] Article III, Section 40, subsection 28. [The General Assembly shall not pass any local or special law; . . . . Granting to any corporation, association or individual any special or exclusive right, privilege or immunity . . . .]

Section 7890 was enacted in 1915, [Laws of 1915, p. 102] the title being "An Act to [604] repeal [certain acts of 1909, 1911 and 1913] relating . . . to 'state banking department,' 'banks of deposit and discount' and 'trust companies,' . . . and to enact in lieu

. . . thereof new articles entitled, respectively, 'state banking department,' 'banks' and 'trust companies.' ''

The purpose of the constitutional provision is to require the true nature of proposed legislation to be stated in the title so that members of the general assembly will not be misled. [50 Am. Jur. 145] The title to the 1915 Act relates solely to banks and trust companies and gives no intimation that a limited group of corporations, other than banks, would be granted special privileges from which all other similar corporations would be excluded. Nor was that subject mentioned in any of the laws repealed by the 1915 Act. We hold that the title is insufficent to cover the extraneous matter injected into the latter part of Section 7890 relating to the transmission of money by check etc. [Ex parte Hunn, 357 Mo. 257, 207 S. W. (2d) 468; State v. Smith, 353 Mo. 808, 184 S. W. (2d) 593; Hunt v. Armour, 345 Mo. 677, 136 S. W. (2d) 312; Fidelity Adj. Co. v. Cook, 339 Mo. 45, 95 S. W. (2d) 1162.]

The latter part of Section 7890 is subject to another constitutional defect in that it attempts to grant special rights and privileges to the special group of corporations therein named.

We concede that the general assembly may pass laws applicable to a particular class, but such a law must bear equally upon all persons coming naturally within the class. [Ex parte French, 315 Mo. 75, 285 S. W. 513; State v. Baskowitz, 250 Mo. 82, 156 S. W. 945; State v. Kimmel, 256 Mo. 611, 165 S. W. 1067.] Section 7890 purports to grant exclusive privilege for the transmission of money by check "or otherwise" to corporations, other than banks, as follows: express companies having contracts with railroad companies; transatlantic steamship companies, or telegraph or telephone companies. It excludes all other companies falling naturally within the class, such as steamship or airplane companies operating in interstate or intrastate trade or across oceans other than the Atlantic; also bus and truck companies and companies operating armed and armoured cars for the transmission of payrolls, etc. The classification is not based upon the licensing, inspection, regulation, financial responsibility or business methods of the companies favored and is arbitrary and unreasonable.

The case of Wedesweiler v. Brundage, 297 Ill. 228, 130 N. E. 520, is squarely in point and sustains our conclusion that the first part of Section 7890 does not cover the business transacted by respondents and that the last part of the section is unconstitutional because not embraced within the title and for unreasonable and arbitrary classification. The Illinois legislature passed an Act entitled "An Act to revise the law with relation to banks and banking." The first section provided for the incorporation of banks. Another section provided that no other persons, firms, etc., shall engage in the business of banking "or shall transact the business of transmitting money to

foreign countries or buying or selling foreign money or receiving money on deposit to be transmitted to foreign countries provided that express, steamship and telegraph companies may continue their business of transmitting money and receiving money to be transmitted;'' A bill was filed by more than fifty complainants, engaged in the business of transmitting money to foreign countries and of buying and selling foreign money, to enjoin the enforcement of the law. The opinion says: ''The inquiry here is, not whether the business of the appellees in question may be regulated by statute, but is whether it can be regulated by a statute which by its title purports to regulate banking only. . . .'' ''We think the language employed should be used in its common, ordinary sense, and when this is done, the banking powers referred to mean such as are ordinarily conferred upon and used by the various banks doing business in the country. The ordinary and usual powers exercised by banks are to discount notes and receive deposits. They may, and often do, possess other powers, but these are the ordinary and usual powers [605] conferred upon and exercised by banks and bankers.'' The opinion says that banks do many other things ''not because they are banking functions or are strictly incidental to the banking business, but because they can do them advantageously in connection with the banking business.'' ''The appellees receive no deposits, pay no checks, make no loans, discount no notes or bills of exchange, buy or sell no bonds, do none of the things which are distinctively characteristic of a bank. No one would suspect that a bill which purported to revise the law in relation to banks and banking would abolish their business any more than it would abolish bond brokerage or private mortgage loans.'' Then the opinion goes on: ''The proviso which exempts express, steamship, and telegraph companies from the prohibition against natural persons, firms, or partnerships, transmitting money to foreign countries also offends against section 22 of article 4 of the Constitution by granting to such companies a special privilege from which all other natural persons are excluded. The privilege of engaging in any lawful business is the right of every individual, of which no one can be deprived except by a general law acting equally on all individuals in the same situation. It is subject to the police power, and must be exercised in accordance with the requirements of statutes passed in the exercise of that power for the protection of the public. No person or class of persons can be excluded from that privilege while others are permitted to enjoy it, unless some reason exists for the distinction having a just relation to the object to be accomplished. No reasonable distinction exists for this proviso. It declares, in effect, that incorporated banks, and express, steamship, and telegraph companies, whether incorporated or not, may engage in the business of transmitting money to foreign countries, but no other natural person, firm or partnership may. So far as incorporated banks are concerned,

the reason for the distinction is apparent. As between natural persons and partnerships on the one hand, and express, steamship, and telegraph companies on the other, the distinction is not based upon any just reason. It has no reference to character, solvency, financial responsibility, security, business, or monetary facilities, incorporation, method of doing business, public inspection, supervision, or report, or any other thing having any relation to the protection of the public from loss by reason of the dishonesty, incompetence, ignorance, or irresponsibility of persons engaging in that business. Under the legislation, if two or more men desire to engage as partners in the business of transmitting money to foreign countries they cannot do so, but if they want to associate themselves as partners in an express, steamship, or telegraph company they may do so, and may then engage in the business of transmitting money to foreign countries. What protection this would be to the public is not apparent. Classification based upon a reasonable difference does not violate the constitutional provision, but a merely arbitrary distinction cannot be sustained.''

The Attorney General cites a later opinion by the Supreme Court of Illinois. [McDougall v. Lueder, 389 Ill. 141, 58 N. E. (2d) 899.] That case involved a different statute and, whether or not it is correctly ruled, we do not regard it as in any way modifying the court's previous opinion in the Wedesweiler case; in fact, the court expressly approves and reaffirms its former opinion. We have studied the many other cases cited by the Attorney General, but deem it unnecessary to review them in detail. We agree that private banking has been abolished in this state; also that the business conducted by the respondents, as shown by the evidence in the instant case, is coupled with a public interest and a proper subject for future statutory regulation. We do not agree that their business has been validly prohibited by Section 7890.

We hold that, properly interpreted, the first part of Section 7890, while valid, does not embrace the business of the respondents; that the evidence does not show that respondents are doing any of the things prohibited by that part of the section. We further hold that the latter part of the section which reads ''nor shall any such corporation, except an express company having contracts with railroad companies for the operation of an express service upon the lines of such railroad companies, [606] or a trans-atlantic steamship company, or a telegraph or telephone company, possess the power of receiving money for transmission or of transmitting the same, by draft, traveler's check, money order or otherwise,'' is unconstitutional and void because not embraced in the title of the 1915 Act, and for unreasonable and arbitrary classification.

Accordingly our writ, heretofore issued herein, is hereby quashed. All concur, except Leedy, C. J., not sitting.